Commonwealth ex rel. Minerd et al., Appellants,
*v.* Margiotti.

Commonwealth ex rel. Reilly, Appellant,
*v.* Margiotti.

Argued November 23, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John Duggan, Jr.,* with him *Dean D. Sturgis* and *Alex Z. Goldstein,* for appellants.

*Charles J. Margiotti,* Attorney General, with him *Edward Friedman* and *E. Russell Shockley,* Deputy Attorneys General, for appellee.

OPINION BY MR. JUSTICE SCHAFFER, December 10, 1936:

The broad question here involved is the power and status of the Attorney General in criminal proceedings.

Whether the remedy invoked, quo warranto, is the proper one, under the circumstances, we pass by, in order that important principles in the administration

of the criminal law may be settled. The propriety of the remedy was not challenged by the respondent, the Attorney General. It may be open to doubt.

A killing took place in Fayette County on September 12, 1936. Frank C. Monaghan, the man whose life is alleged to have been unlawfully taken, was at the time under arrest and in the custody of officers of the law. On September 14, 1936, information was made by the coroner charging the assistant county detective and two members of the State police with Monaghan's murder. Two days later James A. Reilly, district attorney of the county, one of the appellants, petitioned the President Judge of the judicial district to request the Attorney General to retain and employ a special attorney to represent the Commonwealth in the case in accordance with the provisions of section 907 of the Administrative Code of April 9, 1929, P. L. 177, 71 P.S. sec. 297, which reads as follows: "Special Attorneys in Criminal Cases.— When the president judge, in the district having jurisdiction of any criminal proceedings, before any court of oyer and terminer, general jail delivery, or quarter sessions, in this Commonwealth, shall request the Attorney General to do so, in writing, setting forth that, in his judgment, the case is a proper one for the Commonwealth's intervention, the Attorney General is hereby authorized and empowered to retain and employ a special attorney or attorneys, as he may deem necessary, properly to represent the Commonwealth in such proceedings, and to investigate charges, and prosecute the alleged offenders against the law. Any attorney, so retained and employed, shall supersede the district attorney of the county in which the case or cases may arise, and shall investigate, prepare, and bring to trial the case or cases to which he may be assigned. He shall take the oath of office required by law to be taken by district attorneys, and shall be clothed with all the powers and subject to all the liabilities imposed upon them by law. The compensation for services rendered, and necessary

expenses incurred by such attorney or attorneys, shall be fixed by the Attorney General."

Acting upon the petition of the district attorney, the President Judge made request to the Attorney General, who repaired to Fayette County and commenced an investigation which indicated that the district attorney himself and other public officials in the county might be implicated in the alleged crime. The three judges of the courts of the county thereupon asked the Attorney General to personally conduct the prosecution of such persons as might be involved in the crime. The Governor of the Commonwealth directed the Attorney General to continue the investigation and personally to conduct the prosecution of any indictments which should be found. Whereupon the Attorney General designated himself special attorney under the section of the Act of 1929 which has been quoted, and, in that capacity, and as Attorney General, drew and signed indictments charging the district attorney and others with the murder of Monaghan. The Attorney General appeared before the grand jury and presented the evidence which his investigation had disclosed, with the result that certain individuals, including the district attorney, were indicted for murder. Thereafter this proceeding was begun challenging the right of the Attorney General to designate himself as special attorney and to supersede the district attorney. The court below, one of the judges dissenting, dismissed the writ, from which order these appeals are taken.

Appellants' counsel would restrict the review to the question "Whether the Attorney General, when called upon to employ and retain an attorney or attorneys to represent the Commonwealth in particular cases, who are to supersede the district attorney, as provided by section 907 of the Administrative Code of 1929, may employ and retain himself." We think the inquiry which we must make cannot be so circumscribed. It is further stated in the brief: "The powers and prerogatives of the

Attorney General ex officio are not involved. Whether he may conduct an investigation before the grand jury, whether he may appear before the grand jury in an endeavor to procure the indictment of persons charged or suspected of crime, whether he may sign a bill of indictment, or whether he may appear in court and conduct a prosecution against indicted persons, are all beside the point." With this view we cannot agree. The Attorney General carries with him his official character and powers wherever he appears on behalf of the Commonwealth.

The office of Attorney General is an ancient one. It came into being as a necessary adjunct in the administration of the common law of England and was transported to America in the early days of the establishment of government in the colonies as part of their English derived common law. So we learn from Colonial Records, Vol. 1, p. 188, where it appears that at a meeting of the "Councill" at Philadelphia on June 5, 1686, David Lloyd presented his commission given by the Governor, bearing date April 24, 1686, "Constituting him atturney Genll for this Province and Territorys, To wch he was attested, Declaring his allegiance to ye King, fidelity to the Govr & Governmet, and faithfull performance of his Office."

From several sources[1] we learn that the origin of the office of Attorney General and of its common law powers and duties are somewhat obscure. It seems that the

---

[1] Bellot, The Origin of Attorney-General, 25 Law Quarterly Review 400; Stephen, History of the Criminal Law of England, Vol. 1, 493; Stephen, Criminal Procedure from the 13th to the 18th Century, 2 Select Essays in the Anglo-American Legal History 443; 6 Holdsworth, History of English Law 458; Holdsworth, The Early History of the Attorney and Solicitor General, 13 Ill. Law Review 602; De Long, Powers and Duties of the State Attorney-General in Criminal Prosecutions, 25 Journal of Criminal Law 358; Chamber's Encyclopedia. See as to origin and growth of the federal Attorney General and his powers, pamphlet, Origin and Development of the Office of the Attorney General, submitted by President Coolidge to the 70th Congress of the United States.

first record of the King appearing before his court represented by counsel was during the 13th century. During the 13th and 14th centuries, the King had no officials corresponding to an Attorney General and Solicitor General. These offices did not come into existence until the latter part of the 15th and the early 16th centuries. During the early period of English legal history, the King was represented by numerous attorneys. They were appointed by letters patent which set forth their duties, the area over which their authority extended and the courts in which they were to practice. These attorneys were known by various names such as "attornati regis," "narratoreas pro rege," men "qui secuuntur pro rege" and the King's serjeants. During the middle ages the tendency arose to supersede these several attorneys with limited powers by a single attorney with much wider ones and to give this attorney the right to appoint deputies. This process was complete by the end of the 17th century and the two King's attorneys, the Attorney General and the Solicitor General, became the most important law officers of his kingdom.

The most comprehensive statement of the common law duties of the Attorney General in England is found in the New York case *People v. Miner,* 2 Lans. (N. Y.) 396. The opinion in this case states that his duties were: "1st. To prosecute all actions, necessary for the protection and defense of the property and revenues of the Crown. 2d. By information, to bring certain classes of persons accused of crimes and misdemeanors to trial. 3d. By scire facias, to revoke and annul grants made by the Crown improperly, or when forfeited by the grantee thereof. 4th. By information, to recover money or other chattels, or damages for wrongs committed on the land, or other possessions of the Crown. 5th. By writ of quo warranto, to determine the right of him who claims or usurps any office, franchise or liberty, and to vacate the charter, or annul the existence of a corporation, for violation of its charter, or omitting to exercise its cor-

porate powers. 6th. By writ of mandamus, to compel the admission of an officer duly chosen to his office, and to compel his restoration when illegally absent. 7th. By information to chancery, to enforce trusts, and to prevent public nuisances, and the abuse of trust powers. 8th. By proceeding in rem, to recover property to which the Crown may be entitled, by forfeiture for treason, and property, for which there is no other legal owner, such as wrecks, treasure trove, etc. 9th. And in certain cases, by information in chancery, for the protection of the rights of lunatics, and others, who are under the protection of the Crown."

The most important of the duties of the Attorney General for the purposes of the present case are his control and participation in criminal prosecutions. The early records of English criminal prosecutions show that they were conducted by a private prosecutor or by the King's serjeant. This condition existed up until the year 1637 at least. The records of these cases exhibit, however, that in the more important criminal prosecutions, particularly those involving the security of the Crown, the Attorney General and the Solicitor General were present at the trial along with the King's serjeant and often addressed the jury at the conclusion of the trial. This situation existed until the Cromwellian Civil War at which time Blackstone says that the King's premier serjeant was the leading lawyer of his day and took precedence over the King's Attorney General. Following the Civil War and until quite recent times the Attorney General was the only person in England who corresponded to a public prosecutor.

The English Attorney General, under the common law, was the chief law officer of the Crown and the direct ancestor of the chief law officer of the American States. In England he was the legal advisor of the Crown intrusted with the management of all its legal affairs and the prosecution of all suits, civil and criminal, in which the Crown was interested: Blackstone's Commentaries,

pages 308-310; 2 Ruling Case Law, sec. 4, p. 915, 6 Corpus Juris, sec. 1, p. 805; 6 Holdsworth, History of English Law, 466; Howard, Criminal Justice in England 273; De Long, Powers and Duties of the State Attorney General in Criminal Prosecutions, 25 Journal of Criminal Law and Criminology 363-365.

The English common law furnished the basis of American jurisprudence. It was in force throughout the province of Pennsylvania from the earliest times down to January 28, 1777, when the existing statute was enacted which provides: "Each and every one of the laws or acts of general assembly, that were in force and binding on the inhabitants of the said province on the 14th day of May last, shall be in force and binding on the inhabitants of this state, from and after the 10th day of February next, as fully and effectually, to all intents and purposes, as if the said laws, and each of them, had been made or enacted by this general assembly: and all and every person and persons whomsoever are hereby enjoined and required to yield obedience to the said laws, as the case may require, until the said laws or acts of general assembly, respectively, shall be repealed or altered, or until they expire by their own limitation: and the common law and such of the statute laws of England, as have heretofore been in force in the said province, except as hereafter excepted": Act of January 28, 1777, 1 Sm. L. 429, sec. 2, 46 P.S. sec. 152.

The Supreme Court of Illinois had occasion to consider the inquiry which is now engaging our attention, the Attorney General's common law powers, in *Hunt v. Chicago Horse & Dummy Ry. Co.*, 121 Ill. 638, 13 N. E. 176, and said: "Upon the organization of governments in this country, most, if not all, of the commonwealths which derive their system of jurisprudence from England adopted the office of attorney general as it existed in England as a part of the machinery of their respective governments. The prerogatives which pertain to the crown of England are here vested in the people, and the

necessity for the existence of a public officer charged with the protection of public rights and the enforcement of public duties, by proper proceedings in the courts of justice, is just as imperative here as there. The duties of such an office are so numerous and varied that it has not been the policy of legislatures to attempt the difficult task of enumerating them exhaustively, but they have ordinarily been content, after expressly defining such as they have deemed the most important, to leave the residue as they exist at common law, so far as applicable to our jurisprudence and system of government." A like statement is contained in 6 C. J., sec. 13, p. 810, and 2 R. C. L., sec. 5, p. 917. The Supreme Court of Minnesota in *State ex rel. Young v. Robinson,* 101 Minn. 277, 288, 112 N. W. 269, 272, reviewing many authorities, concluded, "Where the question has come up for consideration, it is generally held that the office is clothed in addition to the duties expressly defined by statute with all the power pertaining thereto at the common law." The Supreme Court of Montana in *State ex rel. v. Young,* 54 Mont. 401, 403, 170 Pac. 947, 948, concluded, "It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of Attorney General, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the common law duties attached themselves to the office so far as they are applicable and in harmony with our system of government."

In *Com. v. Kozlowsky,* 238 Mass. 379, 131 N. E. 207, the question was presented to the highest court of Massachusetts whether the Attorney General or his assistant appointed by him was legally entitled to be present during the deliberations of the grand jury. The court in pointing out that a statute, which specifically authorized the District Attorney to appear before the grand jury in capital cases, did not curtail the power of the Attorney General to appear before the grand jury in any criminal

matter, reviewed the origin of the office of Attorney General and the powers pertaining thereto as follows: "When established it became endowed with the powers and duties appertaining to it at common law, so far as pertinent to the needs of the colony and province. It became one of the institutions of the common law brought by the early settlers to these shores, and its functions constituted a part of that body of common law generally recognized as a part of our jurisprudence. . . . The powers and duties of the office appear to have rested largely upon the common law and the needs of the province as manifested in the practical administration of the office until the adoption of the Constitution with little of statutory regulation or modification. . . . Its powers and duties continued as a part of the common law of the commonwealth save as changes have been made by the general court and in the customs of the commonwealth. . . . It often has been recognized that the powers of the Attorney General are not circumscribed by any statute, but that he is clothed with certain common law faculties appurtenant to the office." See also *Com. v. Lewis*, 282 Pa. 306, 311, 127 A. 828.

Today the Attorney General is responsible for the enforcement of the criminal law in at least three of the States of the Union, Delaware, Rhode Island and New Hampshire, and personally participates in the trial of important criminal cases in their courts: Revised Code of Delaware 1915, chap. 17; General Laws of Rhode Island, Acts of 1923, sec. 295; New Hampshire Public Laws, Chap. 16, sec. 5. Many other States recognize the common law powers of the Attorney General and his right to conduct criminal prosecutions: *State v. Finch*, 128 Kan. 665, 280 Pac. 910; *People v. Kramer*, 33 Misc. 209, 213, 68 N. Y. S. 383; *People v. Miner*, 2 Lans. (N. Y.) 396; *Respass v. Com.*, 131 Ky. 807, 115 S. W. 1131, 21 L. R. A. (N.S.) 836; *State v. Moore*, 46 Nev. 65, 207 Pac. 75, 22 A. L. R. 1101; *State v. S. H. Kress & Co.*, 115 Florida 189, 155 So. 823; *State ex rel.*

*Ford v. Young,* 54 Mont. 401, 170 Pac. 947; *Pierce v. Superior Ct.,* 1 Cal. 2nd, 759, 37 Pac. (2d) 460; 2 R. C. L., pages 916, 917, sec. 5. Some of the States hold that their Attorneys General have no common law powers, because the acts of the legislatures which create the office expressly prescribe his duties: *State v. Seattle Gas & Elec. Co.,* 28 Wash. 488, 68 Pac. 946; *Cosson v. Bradshaw,* 160 Iowa 296, 141 N. W. 1062; *State v. Industrial System,* 172 Wis. 415, 179 N. W. 579; *State v. Davidson,* 33 New Mex. 664, 275 Pac. 373.

With the increase in legal business in certain States, the duties of the Attorney General became too onerous and as a result the legislatures passed acts authorizing local officials to conduct the criminal prosecutions in their locality. In several States these acts did not expressly take away from the Attorney General his common law powers, yet it has been held in some of them that the legislature by conferring the criminal powers on other officials impliedly withdrew these powers from the Attorney General: *Ward Baking Co. v. Western Tel. Co.,* 205 App. Div. 723, 200 N. Y. Supp. 865; *State v. Ehrlich,* 65 W. Va. 700, 64 S. E. 935; *Denham v. Robinson,* 72 W. Va. 243, 77 S. E. 970. No such result has been brought about in Pennsylvania by judicial decision or otherwise.

In *Com. v. English,* 11 Phila. 439, 443-444, it is pointed out that "It does not appear that this office [Attorney General] was created by special enactment, but it has been recognized from time to time by the Legislature in fixing the compensation of the official and defining his duties. And whether, as the attorney general of the king under the Province or of the Commonwealth, he has always been considered as the representative of the government in the courts of criminal jurisdiction, with power to prosecute offenders therein." A note in 10 Smith's Laws, page 4, is enlightening on the subject with which we are now dealing. "It does not appear that the office of attorney general has been created or its general

duties prescribed by law, although often recognized, specific duties assigned to it, and fees provided for various services, especially by the act of 1821, 7 vol. 367. The attorney general, whether of the king, under the province, or of the commonwealth, is always considered as the representative of the government in the courts of criminal jurisdiction, with power to prosecute offenders therein, and by implication to arrest proceedings, unless prohibited by law, as by the act of 1819, which declares that after indictment found, it shall not be lawful for the attorney general to enter a nolle prosequi, except in cases of assault and battery, fornication and bastardy, on agreement of parties, or in prosecutions for tippling houses with consent of the court: 7 vol. 227."

Pennsylvania's first Constitution, that of 1776, provided in section 20 for the appointment of an Attorney General, but in the Constitutions of 1790 and 1838 such an office was not mentioned. During the period while these Constitutions were in effect, there was always an Attorney General functioning in the Commonwealth. The Constitution of 1874, art. IV, sec. 1, provides for an Attorney General as part of the executive department of the State government and the same article, sec. 9, designates him as a member of the Board of Pardons. Wisely, it would seem, his duties and powers were left undefined and are, therefore, such as the common law conferred upon him, unless limited or enlarged by statute.

The first act of assembly which in any way provided for the appointment of an Attorney General was that of April 21, 1857, P. L. 266, 71 P.S. 811. The statutes prior to 1857 referring to this office were largely concerned with the fees to be charged, a few with the imposition of some specific power or duty such as the quo warranto act of June 14, 1836, sec. 3, P. L. 621, 12 P.S. sec. 2023, which was largely a restatement of his common law power in this field, and, in at least one instance with the curtailment of a common law power (Act of 1819, 7 Sm.

L. 227) which limited the broad common law power to enter a nolle prosequi.

Prior to 1850 it was the custom of the Attorney General, exclusively by virtue of his common law powers and duties, to prosecute all criminal cases, and for him to appoint deputy Attorneys General in the various counties to represent him in their prosecutions. Thus, in *Com. v. English,* 11 Phila. 439, it was stated by Judge PRATT that: "Prior to the act of 1850, creating the office of district attorney, the pleas of the commonwealth were all conducted by the attorney general or his deputies, whom he was authorized by law to appoint, but whose duties have never been fully defined by the legislature. Presumably then, they were the same in the district in which he acted as were those of his principal, the attorney general himself."

The Act of May 3, 1850, P. L. 654, 16 P.S. sec. 3431, created the elective office of district attorney, which was unknown at the common law, and among other things provided: "The officer so elected shall sign all bills of indictment, and conduct in court all criminal and other prosecutions in the name of the commonwealth, or when the state is a party, which arise in the county for which he is elected, and perform all the duties which now by law are to be performed by deputy attorney generals, and receive the same fees or emoluments of office." This act took from the Attorney General none of his powers. Since the passage of the act, the various district attorneys have conducted the prosecution of criminal cases except in particular instances, where under the Act of March 12, 1866, P. L. 85, now repealed, judges have appointed special prosecutors, or, where the Attorney General has employed a special prosecutor upon the request of the president judge of a particular district.

Aside from the Act of April 21, 1857, previously mentioned, many statutes were subsequently passed pertaining to the personnel and the functions of the office of Attorney General. The Administrative Code of 1923

(Act of June 7, 1923, P. L. 498) repealed and reënacted
a number of these prior statutory provisions. This Code
in turn was superseded by the Administrative Code of
1929 (Act of April 9, 1929, P. L. 177) which sets forth
many of the present statutory powers of the Department
of Justice (Secs. 902-908, 71 P.S. secs. 292-298) and pro-
vides that the head of the department, namely, the At-
torney General, shall exercise such powers. (See sec.
206, 71 P.S. sec. 66.)

We quite recently had occasion to consider the pre-
rogatives of the Attorney General in *Com. v. Lehman,*
309 Pa. 486, where the defendant objected to the super-
seding of the district attorney by a special prosecutor
appointed by the Attorney General. Speaking through
Mr. Justice LINN, we observed: "Prior to the Act of
May 3, 1850, P. L. 654, 16 P.S. sec. 1691, the attorney
general was represented in each county by his deputy
who conducted criminal prosecutions; by that statute
the office of district attorney was created and that offi-
cer was charged with the performance of the duties
thertofore performed by the deputy attorney general.
Thereafter the prosecutor was elected instead of ap-
pointed, but the power of general supervision vested in
the attorney general over the performance of a district
attorney's duties in the county was not taken away;
that power remained, and it is matter of general infor-
mation that the power had been exercised from time to
time when necessary. In part, this supervision is now
regulated by section 907 of the Administrative Code.
Consideration of the historic development in this Com-
monwealth of the office of attorney general and the
office of district attorney at once distinguishes the cases
cited by appellant from other states said to hold that the
legislature may not provide for temporarily displacing
prosecuting attorneys."

We conclude from the review of decided cases and his-
torical and other authorities that the Attorney General
of Pennsylvania is clothed with the powers and attri-

butes which enveloped Attorneys General at common law, including the right to investigate criminal acts, to institute proceedings in the several counties of the Commonwealth, to sign indictments, to appear before the grand jury and submit testimony, to appear in court and to try criminal cases on the Commonwealth's behalf,[2] and, in any and all these activities to supersede and set aside the district attorney when in the Attorney General's judgment such action may be necessary.

The foregoing would seem to dispose on broad principles of the entire controversy before us, but to settle certain specific questions raised and to compass the whole field of inquiry we proceed.

Section 907 of the Administrative Code of 1929 and all similar laws which preceded it, providing that the Attorney General may retain and employ a special attorney to represent the Commonwealth in criminal proceedings recognize that the Attorney General is the fountain head from which arises the right to represent the Commonwealth in criminal cases.

It is argued that the special attorney thus appointed holds an office. We think this by no means follows. He is just what the act says he is, a special attorney "retained and employed" by the Attorney General to represent the Commonwealth in the particular matter or matters just as the Attorney General may retain and employ special attorneys to represent the Commonwealth in other special situations when in his judgment it is proper to do so. The person so retained and employed is the representative of the Attorney General for the time being and in the business confided to his care. The attorney so retained and employed, under the terms of the act, supersedes the district attorney only in the case or cases to which he may be assigned, not generally.

---

[2] The writer of this opinion recalls that in the Capitol Graft cases, in which he was of counsel (*Com. v. Mathues,* 40 Pa. Superior Ct. 546), the then Attorney General, M. Hampton Todd, appeared in and actively took part in the trials.

It is further argued that the Act of 1929, having provided for the appointment of special attorneys and specified their duties and powers, the course provided by the act is controlling and exclusive under the terms of the Act of March 21, 1806, 4 Sm. L. 326, sec. 13, 46 P.S. sec. 156, which reads: "In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this Commonwealth, the directions of the said acts shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such act or acts into effect." It is said that because of this statute the Attorney General may not name himself as special attorney, but must follow the Act of 1929 and appoint another. The whole line of decisions under the Act of 1806 shows that it has no bearing on the situation before us, but, if it had, the complete answer is that the Attorney General did not have to appoint himself. In virtue of his high office without more, he could act in the manner he has. We can see no valid reason why the Attorney General should not designate himself as special prosecuting attorney if the exigency in his judgment required this to be done and if such action was necessary to qualify him to act. As heretofore pointed out, we think such designation not necessary in view of the Attorney General's broad common law powers. These powers were in no wise curtailed by the 907th section of the Administrative Code. It may have somewhat enlarged them. It was a recognition of the common law powers which he already possessed and provided the manner of their exercise.

The cases called to our attention such as *Com. v. Douglass,* 1 Binney 77; *Com. v. Bowman,* 44 C. C. 127; *Young v. City of Mankato,* 97 Minn. 4, 105 N. W. 969, which hold that an official may not appoint himself to another office have no application. The Attorney General has not appointed himself to another office. He is

assuming duties which he might have passed on to a subordinate, and incidentally, so we are informed, proposes to discharge them without cost to the State or the county so far as his services are concerned. There can be no question in this case that the district attorney should be displaced. He cannot prosecute himself. It is conceded that he may be displaced by some one whom the Attorney General may retain and employ. It is difficult to give a sound reason why the Attorney General, instead of retaining another lawyer, shall not step into the breach himself. The Act does not say that he may not do so, it simply authorizes him to name another if in his opinion that is the proper thing to do. But, as before stated, we think it was not necessary for the Attorney General to name himself as special attorney. He could act in person without assuming the lesser role. He could under the circumstances here existing have done so without request from the president judge. We agree with what was said in *State ex rel. v. Robinson,* supra, "We have numerous instances where particular duties are expressly imposed upon the county attorney, yet it is clear that the attorney general has the right, in virtue of his office, to coöperate with or act independently of that official in all cases where the public interests justify it." *Snyder's Case,* 301 Pa. 276, 152 A. 33, called to our attention in appellants' brief has no bearing on the controversy now before us; that was a disbarment proceeding against a lawyer who happened to be district attorney. The conclusion at which we arrive in this case in no manner conflicts with the one reached in that action. In this connection, and as to the constitutionality of section 907 of the Act of 1929, see *Com. v. Havrilla,* 38 Pa. Superior Ct. 292; *Com. v. McHale,* 97 Pa. 397, and *Com. v. Lehman,* supra.

The Code of 1929 places the Attorney General at the head of the Department of Justice, the most responsible post in the State government after that of the Governor. Section 904 provides: "The Department of Justice shall

have the power, and its duty shall be, with the approval of the Governor: (a) To investigate any violations, or alleged violations, of the laws of the Commonwealth which may come to its notice; (b) To take such steps, and adopt such means, as may be reasonably necessary to enforce the laws of the Commonwealth." This enjoins upon the Attorney General some of the most important duties in the conduct of government and could never have been intended to lessen his powers to achieve the purposes contemplated or the ends desired. Furthermore, the Attorney General is here acting under the direct command of the Governor, who is charged with the people's mandate (Constitution, Art. IV, sec. 2) to "take care that the laws be faithfully executed." It could not have been purposed, when the tables of our basic law were brought forth, that the most important arm which the Governor possesses to carry out this mandate under ordinary and usual conditions, the Attorney General, should be stripped of powers which, almost immemorially, the holder of that high office has possessed.

The orders of the court below are affirmed at appellants' cost.